UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PAUL BENSON, | : | **3:26-CV-01472** |
| Plaintiff, | : | (Magistrate Judge Schwab) |
| v. | : | |
| YOLANDA PRYCE, *et al.*, | : | |
| Defendants. | : | |

**REPORT AND RECOMMENDATION**

## I. Introduction.

Plaintiff Paul Benson complains about events in connection with state child support proceedings. He filed a motion for a temporary restraining order and preliminary injunction. Because Benson has not shown that he has a reasonable likelihood of success on the merits, he is not entitled to a temporary restraining order or a preliminary injunction. Thus, we recommend that the court deny his motion for a temporary restraining order and preliminary injunction. Also, because some of Benson's claims are barred by the Eleventh Amendment, we recommend that the court dismiss those claims for lack of subject-matter jurisdiction. Finally, we recommend that the court remand this case to the undersigned for further proceedings.

**II. Background and Procedural History.**

On June 1, 2026, Benson began this action by filing a complaint. *See doc. 1*. He names three defendants in his complaint: (1) Yolanda Pryce, an enforcement specialist with the Monroe County Domestic Relations Section; (2) the Honorable C. Daniel Higgins, Jr., a judge of the Court of Common Pleas of Monroe County; and (3) the Monroe County Domestic Relations Section. *Id.* at 1 (caption), ¶¶ 9–11. Benson names Pryce and Higgins in both their individual capacities and their official capacities. *Id*. ¶¶ 9, 11. Benson's claims stem from child support proceedings in the Court of Common Pleas of Monroe County. He alleges the following facts in his complaint.

Benson is a disabled veteran. *Id*. ¶¶ 1, 8. He has a support case run by Monroe County Domestic Relations. *Id*. ¶ 12. On February 27, 2026, Pryce sent him an enforcement email. *Id*. ¶ 13.[1] On March 2, 2026, Benson responded with an informal email asking for verification of the legal basis for the support obligation ("Verification Request"). *Id*.[2] He asked whether the support obligation was a loan or a debt and whether he consented to such, and he questioned the

[1] Benson attached a copy of this email as an exhibit to his complaint. *See doc. 1-2* at 8.

[2] Benson attached a copy of this email as an exhibit to his complaint. *See doc. 1-2* at 2–7.

constitutional basis for forcing payment without consent. *Id*. ¶ 14. Pryce did not respond. *Id*. ¶ 15.

Benson alleges that a "Congressional Research Service report, Child Support Enforcement: Program Basics (Jan. 12, 2026), shows that Defendants and their agency have direct financial interests in collecting support." *Doc. 1* ¶ 33.[3] In this

---

[3] Benson attached a copy of this report as an exhibit to his complaint. *See doc. 1-11*. In a section titled "Child Support Enforcement: Program Basics," the report contains an overview that provides, in pertinent part:

> The Child Support Enforcement (CSE) program was enacted in 1975 as a federal-state program (established in Title IV-D of the Social Security Act). The primary purpose of this program was to reduce public expenditures for recipients of cash assistance by obtaining ongoing support from noncustodial parents that could be used to reimburse the state and federal governments for part of that assistance. (This purpose often is referred to as *public assistance cost-recovery*.) Relatedly, the program also sought to strengthen families by securing financial support for children from their noncustodial parents on a consistent and continuing basis to enable some of those families to remain off public assistance. Over the years, CSE has evolved into a multifaceted program. While public assistance cost-recovery still remains an important function of the program, its other aspects include service delivery and promotion of self-sufficiency and parental responsibility. The CSE program has different rules for assistance families (e.g., those receiving cash benefits under the Temporary Assistance for Needy Families program; TANF) and non-assistance families.
>
> . . .
>
> The CSE program has a vast array of enforcement methods at its disposal. Most child support payments are collected from noncustodial parents through income withholding. Other methods of enforcement include intercepting federal and state

regard, he asserts that "[s]upport rights are assigned to the state for TANF families, and collections reimburse state and federal governments," "[d]efendants get 66% federal matching funds for every dollar they spend on enforcement," and "[t]hey also get federal incentive payment and block grant funding (about $532 million nationally in FY2023)." *Id.* According to Benson, "[t]his financial interest gives them a reason to push hard for collections and to ignore verification requests." *Id.* ¶ 34.

---

> income tax refunds; intercepting unemployment compensation; filing liens against property; sending insurance settlement information to CSE agencies; intercepting lottery winnings, judgments, or settlements; seizing debtor parent assets held by public or private retirement funds and financial institutions; withholding, suspending, or restricting driver's licenses, professional or occupational licenses, and recreational or sporting licenses; and denying, revoking, or restricting passports.
>
> The CSE program is funded via a number of sources. The program is a federal-state matching grant program under which states must spend money in order to receive federal funding. For every dollar a state spends on CSE expenditures, it generally is reimbursed 66 cents from the federal government. This reimbursement requirement is "open ended," in that there is no upper limit or ceiling on the federal government's match of those expenditures. In addition to matching funds, states receive CSE incentive payments from the federal government. States also collect child support on behalf of families receiving TANF assistance to reimburse themselves (and the federal government) for the cost of that assistance to the families. Fees and costs recovered also help finance the CSE program.

*Doc. 1-11* at 3.

On March 2, 2026, Benson received a notice dated February 27, 2026, titled "Notice of Reporting to the Pennsylvania State Tax Refund Offset Program." *Id.* ¶ *16; Doc. 1-3* at 2.[4] Benson refers to this notice as a STROP notice. *Id.* ¶ 16. The STROP notice claimed that Benson owed overdue support payments in the amount of $332.68, and the notice threatened to intercept state tax refunds. *Id.*

On March 6, 2026, Pryce issued a "Notice of Credit Bureau Reporting," which claimed that Benson was in arrears as of that date in the amount of $3,506.68. *Id.* ¶ 17.[5]

On March 10, 2026, Pryce filed a petition for contempt. *Id.* ¶ 19.[6] That same day—March 10, 2026—the Court issued a per curiam order that, among other things, provided: "Legal proceedings have been brought against you alleging you

---

[4] Benson attached a copy of this notice as an exhibit to his complaint. *See doc. 1-3* at 2. The same exhibit containing this notice also contains another notice titled "Notice of Non-Compliance (Financial Only)" dated February 27, 2026, stating that Benson was in arrears in the amount of $2,448.68. *Id.* at 3.

[5] Benson attached a copy of this notice as an exhibit to his complaint. *See doc. 1-4*.

[6] Benson attached a copy of this petition as an exhibit to his complaint. *See doc. 1-6.* In this petition, Pryce asserted that on October 29, 2025, the court entered an order directing Benson to pay $1,058 per month plus $100 per month in arrears for support and that Benson has failed to comply with the order by failing to pay as ordered. *Id.* Pryce requested that the court issue an order directing Benson to attend a hearing on the petition and after the hearing, adjudicate Benson in contempt. *Id.*

have disobeyed an Order of Court for support." *Id*. ¶ 18.[7] Benson suggests that he has never seen that support order. *Id*. The March 10, 2026 order also scheduled a hearing for May 26, 2026, at 9:00 a.m. in courtroom to be determined. *Id*. ¶ 22; *Doc. 1-5*. And it warned Benson: "**IF YOU DO NOT APPEAR, THE COURT MAY ISSUE A WARRANT FOR YOUR ARREST AND YOU MAY BE COMMITTED TO JAIL.**" *Doc. 1-5* (all caps and bold in original). It also warned Benson that "[i]f the Court finds that you have willfully failed to comply with its order for support, you may be found in contempt of court and committed to jail, fined, or both." *Id*.

Also on March 10, 2026, Pryce issued a notice, which Benson refers to as a "Consideration notice" asserting that Benson could avoid contempt by making a lump sum payment of $3,500, which Benson points out is almost the exact amount of claimed arrears and which, he contends, was designed to be impossible to pay. *Id*. ¶¶ 20–21.[8]

Benson asserts that the "Defendants have sent multiple notices with different numbers that cannot all be true[.]" *Id*. ¶ 24. On March 15, 2026, Benson followed

---

[7] Benson attached a copy of this order as an exhibit to his complaint. *See doc. 1-5.*

[8] Benson attached a copy of this notice as an exhibit to his complaint. *See doc. 1-7.*

up his Verification Request with a certified letter. *Id*. ¶ 29. But the defendants have not "answered the yes/no question (loan or debt?)"; "produced any signed paper where [Benson] agreed to the debt"; "identified any constitutional provision allowing this obligation without consent"; "given a consistent, verified and authenticated accounting"; or "responded to [Benson's] jurisdictional questions." *Id*. He further asserts that the contempt hearing threatens his liberty based on an unverified obligation, for which the defendants have refused to provide a constitutional basis. *Id*. ¶ 23.

On March 19, 2026, the Monroe County Domestic Relations Section issued a notice stating that the past due amount of support due was "$1,390.00 (non-TANF)." *Id*. ¶ 25.[9] Benson suggests that he responded to the March 19, 2026 notice "(including the ADA request),"[10] and after he did so, Pryce—on April 6, 2026—left a voicemail for Benson asking him to contact her office. *Id*. ¶ 35. Benson responded by email "repeating that he wanted written communication,

[9] Benson attached a copy of this notice as an exhibit to his complaint. *See doc. 1-8.*

[10] Benson has not attached to his complaint a copy of a written response to the March 19, 2026 notice, and he does not provide any further allegations regarding an ADA-accommodation request.

pointing out the contradictory amounts, and demanding verification." *Id*. ¶ 36.[11] Pryce "has not answered the substance" of that response. *Id*.

On March 24, 2026, "upon view of Defendant's contest to the Notice of Reporting to the Pennsylvania State Tax Refund Offset Program (STROP)," Judge Higgins scheduled a hearing for June 9, 2026, and stayed the STROP referral "pending disposition." *Doc. 1-12*.

On April 3, 2026, Pryce issued a notice of intent to suspend Benson's driver's license under 23 Pa. C.S. § 4355, claiming he owes overdue support in the amount of $3,506.68. *Doc. 1* ¶ 26.[12] The notice further states:

> In accordance with Pennsylvania statute, 23 Pa.C.S. § 4355, an order to suspend, nonrenew, or deny your driver's licenses and/or commercial driver's license will be issued to the Pennsylvania Department of Transportation thirty (30) days from the date of this notice if you fail to take one of the following actions:
>
>> (1) Pay the amount of the overdue support in full;
>> (2) Establish a periodic payment schedule that is approved by the court;
>> (3) Provide the court with a source of periodic income that can be attached; or
>> (4) Successfully contest this notice.

---

[11] Benson attached as part of an exhibit to his complaint an email exchange between Pryce and him on April 7, 2026. *See doc. 1-2* at 9–10. It is not clear if this is the email to which he is referring.

[12] Benson attached a copy of this notice as an exhibit to his complaint. *See doc. 1-9.*

*Doc. 1-9* at 2. The notice also lists the address the Domestic Relations Section, and it provides: "Contact the DRS listed above for instructions on how to contest this notice on or before May 3, 2026. Grounds for contesting this notice are limited to mistakes of fact, i.e., errors in the amount of overdue support owed and/or mistaken identity." *Id.*

Benson asserts that the notices issued on March 19, 2026, and April 3, 2026, claim different amounts of arrears with no explanation, and this shows that the defendants do not have a reliable accounting and they are seeking "enforcement (jail, license suspension) based on unverified and self-contradictory numbers." *Id.* ¶¶ 27–28.

In April 2026, the defendants sent a payment ledger, purporting to show payments and arrears. *Id.* ¶ 31.[13] According to Benson the ledger is not a certified account, it is deficient, "[i]t does not explain the 66% drop from $3,506.68 to $1,390"; "[i]t does not account for the federal matching funds or TANF reimbursement," "[i]t does not show [his] consent," "[i]t does not give any constitutional authority," and "[i]t fails to show any current distributions to Kristy Benson or any of the TANF accounting measures." *Id.* ¶ 32.

[13] Benson attached a copy of this ledger as an exhibit to his complaint. *See doc. 1-10.* Although Benson alleges that the ledger shows payments and arrears from June 2025 to April 2026, *doc. 1* ¶ 31, the ledger starts with the date of January 27, 2025, and ends with the date of April 1, 2026, *doc. 1-10* at 2–3.

On May 5, 2026, Judge Higgins issued an order that provided "it is hereby Directed that all operating privileges, including but not limited to driver's license and/or commercial driver's license, of PAUL N. BENSON, Defendant, license #24992646, shall be suspended, not renewed, or denied until further Order of the Court." *Doc. 1* ¶ 37.[14] According to Benson, Judge Higgins's May 5, 2026 Order was "in direct contradiction to the spirit of his previous order staying STROP enforcement." *Id*. And Benson alleges that the May 5, 2026 "order was issued without any meaningful pre-deprivation hearing on the factual basis for the suspension, without resolving the contradictory arrears figures, and without addressing [his] outstanding Verification Request." *Id*. ¶ 38. He alleges that "[t]he timing and content of the order show that it is a direct act of retaliation. It came after [he] had: (a) sent his initial Verification Request; (b) sent a follow-up certified letter; (c) filed a draft federal complaint and sent it to the Defendants; and (d) explicitly raised the unconstitutionality of the enforcement actions." *Id*. ¶¶ 39, 45. Benson characterizes the May 5, 2026 Order "as the 'final nail in the coffin' to punish [him] for his protected speech and petitioning," and as "an indefinite, judicially-imposed barrier to driving—the most severe sanction short of incarceration." *Id*. ¶¶ 39–40.

[14] Benson attached a copy of this order as an exhibit to his complaint. *See doc. 1-13*.

Benson's physician recommended medical marijuana "for a qualifying serious medical condition related to [Benson's] disability," Benson is enrolled the Pennsylvania Medical Marijuana Program ("MMP"), and he holds a valid MMP identification card. *Id*. ¶ 41. "Under Pennsylvania regulations, a patient must present 'a valid photo driver's license or photo identification card (not expired or suspended)' to obtain medication." *Id*. ¶ 42. But, according to Benson, "[b]y suspending [his] driver's license, the May 5, 2026 order directly impedes his ability to maintain his registration and physically acquire his physician-recommended mediation," which places him "at imminent risk of being unable to obtain his medication, causing pain, suffering, and deterioration of his medical condition." *Id*. ¶¶ 42–43.

Benson also asserts that the license suspension strips him "of the practical ability to parent his children, attend their events, or respond to emergencies." *Id*. ¶ 47. In this regard, he alleges that "the May 5, 2026 order directly contradicts a pre-existing custody order issued by the Monroe County Court of Common Pleas," which "requires [him] to maintain a valid driver's license for purposes of exercising parenting time with his minor children, including transportation for visitation exchanges, school events, medical appointments, and other parental

responsibilities." *Id*. ¶ 46.[15] He contends that the May 5, 2026 order "makes compliance with the custody order impossible." *Id*. ¶ 47. And, he asserts, the "conflict between the support enforcement order and the custody order demonstrates that the license suspension was not a measured response to non-payment, but rather a punitive and retaliatory act designed to inflict maximum harm on [him] and his family without regard to the best interests of the children." *Id*. ¶ 48. Benson also alleges that the license suspension interferes with this right to travel, his ability to engage in community service, and his right to assemble. *Id*. ¶¶ 55–57.[16] He alleges that "[a]ll of these actions are umbrellaed under the Domestic Relations Section, therefore all defendants knew or should have known of the retaliatory effect of this order." *Id*. ¶ 49.

The complaint contains six counts all brought pursuant to 42 U.S.C. § 1983. *Id*. ¶¶ 58–91. Count 1 is a First Amendment retaliation claim. *Id*. ¶¶ 60–65. In this

[15] Benson attached a copy of a November 25, 2024 Order from Judge Sibum that provides that "following a Conciliation Conference conducted pursuant to Pa. R.C.P. 1915.4–3, the attached recommendation of the Conciliator is adopted as an Interim Order of Court." *Doc. 1-14* at 2. And he attached what appears to be a portion of the recommendation from the Conciliator that provides, in pertinent part: "Anyone transporting the children must possess a valid driver's license and use a vehicle with current insurance, inspection, and registration." *Id*. at 3.

[16] Benson also sets forth what he contends is the law regarding the right to travel, *doc. 1* ¶¶ 50–54, and qualified immunity, *id*. at 28–29 ¶¶ 76–77. We do not recount those legal conclusions here.

count, Benson alleges that he engaged in protected activity when he sent his Verification Request, that the defendants took adverse actions—including threatening contempt, demanding a $3,500 lump sum payment, credit-bureau reporting, and suspension of this driver's license. *Id*. ¶¶ 62–63. According to Benson, "[t]he timing shows a connection: all these actions happened within weeks of [his] request and as preemptive measures before any hearing had occurred." *Id*. ¶ 64. Thus, he contends, "[t]here is a direct causal chain from protected activity to escalated retaliation." *Id*.

Count 2 is a Fourteenth Amendment procedural due process claim. *Id*. ¶¶ 66–73. In this count, Benson contends that he has protected interests: "freedom from jail (liberty), his driver's license (a protectable property and liberty interest under Pennsylvania law and the Due Process Clause), his ability to access prescribed medication (a fundamental liberty interest in bodily integrity and medical care), his bank accounts, tax refunds, and credit reputation (property). *Id*. ¶ 68. He asserts that the defendants' actions "rely on an obligation they refuse to verify and for which they give no constitutional authority." *Id*. And he asserts that the May 5, 2026 order "was issued without a meaningful pre-deprivation hearing on the specific issue of whether the suspension is warranted given the contradictory arrears and the unresolved Verification Request." *Id*.

Count 3 is entitled "ULTRA VIRES (Lack of Constitutional Authority)." *Id*. ¶¶ 74–79. In this count, Benson asserts that the Constitution does not give either the federal government or the states "any power over compulsory private money transfers between citizens without consent," the defendants have refused to identify a constitutional provision that gives them authority, and they do not have lawful jurisdiction. *Id*. ¶¶ 76–78. Thus, according to Benson, their actions are ultra vires. *Id*. ¶¶ 75–79.

Count 4 is entitled "STRUCTURAL BIAS (Government's Financial Interest)." *Id*. ¶¶ 80–85. In this count, Benson asserts that due process requires a neutral decision maker, but, as shown by the Congressional Research Service report he attached, the defendants have a direct financial and "pecuniary interest in collecting as much as possible, enforcing aggressively, and resisting verification." *Id*. ¶ ¶81–83. Thus, he suggests, the defendants are biased, and this bias infected the proceedings in his case. *Id*. ¶¶ 81, 83–84.

Count 5 is entitled "MUNICIPAL LIABLITY (Monell)." *Id*. ¶¶ 86–88. In this count, Benson asserts that the Monroe County Domestic Relations Section failed to train Pryce and it has policies or customs "of refusing to answer jurisdiction verification requests"; "of retaliating against people who challenge the legal basis of an obligation"; "of pursuing contempt and license suspension without first providing requested verification"; "of sending out contradictory arrears

notices without fixing them"; and "of seeking or acquiescing in judicial orders that impose severe sanctions, like indefinite license suspension, without any genuine pre-deprivation review." *Id*. ¶ 88. He contends that the Monroe County Domestic Relations Section is a government entity that can be sued under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

Count 6 is a claim for violation of the right to travel purportedly based on the First, Fifth, and Fourteenth Amendments. *Id*. ¶¶ 89–91. In this count, Benson contends that the May 5, 2026 Order burdens his right to travel, and the "Defendants have no compelling governmental interest in suspending the license of a parent who has consistently challenged the validity of the underlying obligation and whose arrears figures are demonstrably contradictory and unreliable." *Id*. ¶¶ 90–91.

Benson seeks declaratory and injunctive relief, compensatory and punitive damages, costs, and "any other relief the Court finds just." *Id*. at 30–32 (Wherefore Clause). More specifically, as to declaratory relief, Benson seeks a declaration that the defendants violated the First and Fourteenth Amendments and acted ultra vires. Wherefore Clause ¶¶ C–D. And as to injunctive relief, Benson seeks a temporary restraining order and preliminary injunction "[v]acating or staying the May 5, 2026 order of license suspension to allow [him] to maintain valid identification for medical purposes"; "[e]njoining Defendants from proceeding with the May 26,

2026 contempt hearing"; "[o]rdering Defendants to cease all other enforcement actions until they have . . . [a]nswered [his] Verification Request in good faith [and] [g]iven a verified, consistent authenticated accounting that fixes the contradictory notices[.]" *Id*. ¶ E; *Id*. at 29–30, ¶¶ 80–83.[17]

Because at the time he began this action, Benson had not paid the filing fee or filed an application to proceed *in forma pauperis*, we ordered him to do one or the other. *See doc. 6*. On June 30, 2026, Benson paid the filing fee. We then ordered Benson to serve the summons and the complaint on the defendants in accordance with Fed. R. Civ. P. 4 or obtain a waiver of service from the defendants, and we ordered that Benson shall file a return of service within 90 days of the date he filed the complaint. *Doc. 8*.

## III. Discussion.

At the time he filed his complaint, Benson also filed a motion for temporary restraining order and a preliminary injunction and a brief in support of that motion. *See docs. 3, 4*. Since Benson has recently paid the filing fee for this action, we

[17] Benson's numbering of the paragraphs in his complaint is not consistent. He has two sets of paragraphs numbered 76–83. The second set of paragraphs numbered 76–79 are his allegations regarding the law of qualified immunity, which as noted above, *see supra* n.16, we do not recount because they are legal conclusions. The second set of paragraphs numbers 80–83 deal with Benson's request for emergency injunctive relief, and it is those paragraphs to which we are referring above.

now proceed to address his motion for temporary restraining order and preliminary injunction. Before we do so, however, we address the issue of the court's subject-matter jurisdiction over some of Benson's claims.

### A. The Eleventh Amendment bars some of Benson's claims.

"Federal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.,* 511 U.S. 375, 377 (1994). "[T]hey have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto." *Bender v. Williamsport Area School Dist.,* 475 U.S. 534, 541 (1986). "Subject-matter jurisdiction can never be waived or forfeited." *Gonzalez v. Thaler,* 565 U.S. 134, 141 (2012). Thus, the court has an obligation to satisfy itself that it has subject-matter jurisdiction, and the court may raise the issue sua sponte. *Nesbit v. Gears Unlimited, Inc.,* 347 F.3d 72, 77–78 (3d Cir. 2003).

The Eleventh Amendment implicates the court's subject-matter jurisdiction. *See Durham v. Kelley*, 82 F.4th 217, 227 (3d Cir. 2023) (stating that the Eleventh Amendment "imposes a jurisdictional bar against individuals bringing suit against a state or its agencies in federal court, or against a state official in his or her official capacity"); *Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Human Servs.*, 730 F.3d 291, 318 (3d Cir. 2013) ("Therefore, unless Congress has 'specifically abrogated' the states' sovereign immunity or a state has unequivocally

consented to suit in federal court, we lack jurisdiction to grant relief in such cases."); *Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690, 693, n.2 (3d Cir. 1996) (noting that "the Eleventh Amendment is a jurisdictional bar which deprives federal courts of subject matter jurisdiction"); *but see Lombardo v. Pennsylvania, Dep't of Pub. Welfare*, 540 F.3d 190, 197 (3d Cir. 2008) (noting that "the Supreme Court's jurisprudence has not been entirely consistent in the view that the Eleventh Amendment restricts subject matter jurisdiction").

"Our federalist system of government accords respect for the sovereignty of the States in a variety of ways, including the Eleventh Amendment to the United States Constitution, which immunizes States from suits brought in federal court by both their own citizens and citizens of other States." *Maliandi v. Montclair State Univ.*, 845 F.3d 77, 81 (3d Cir. 2016). The Eleventh Amendment provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. Amend. XI. Although its text appears to restrict only the Article III diversity jurisdiction of the federal courts, the Eleventh Amendment has been interpreted '"to stand not so much for what it says, but for the presupposition . . . which it confirms."' *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996) (quoting *Blatchford v. Native Village of Noatak*, 501 U.S. 775, 779 (1991)). That presupposition is that each state is a sovereign entity in our federal system and it is

inherent in the nature of sovereignty that a sovereign is not amenable to suit unless it consents. *Id.*

"Immunity from suit in federal court under the Eleventh Amendment is designed to preserve the delicate and 'proper balance between the supremacy of federal law and the separate sovereignty of the States.'" *Karns v. Shanahan*, 879 F.3d 504, 512 (3d Cir. 2018) (quoting *Alden v. Maine*, 527 U.S. 706, 757 (1999)). It "serves two fundamental imperatives: safeguarding the dignity of the states and ensuring their financial solvency." *Id*. It serves those interests by barring suits against nonconsenting states. *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 73 (2000) (stating that "the Constitution does not provide for federal jurisdiction over suits against nonconsenting States"); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984) ("It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment.").

There are two circumstances when the Eleventh Amendment does not bar a suit against a state or state agency. First, a state may waive its Eleventh Amendment immunity by consenting to suit. *College Savings Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 666, 670 (1999). Second, Congress may abrogate a state's Eleventh Amendment immunity when it unequivocally intends to do so and when it acts pursuant to a valid grant of

constitutional authority. *Geness v. Admin. Off. of Pennsylvania Cts.*, 974 F.3d 263, 269–70 (3d Cir. 2020).

Neither of those circumstances are present here. The Commonwealth of Pennsylvania has not waived its Eleventh Amendment immunity. *See* 42 Pa. Stat. and Cons. Stat. Ann. § 8521(b) ("Nothing contained in this subchapter shall be construed to waive the immunity of the Commonwealth from suit in Federal courts guaranteed by the Eleventh Amendment to the Constitution of the United States."); *Downey v. Pennsylvania Dep't of Corr.*, 968 F.3d 299, 310 (3d Cir. 2020) ("Pennsylvania has not waived its sovereign immunity defense in federal court."). And 42 U.S.C. §1983, under which Benson brings his claims, does not override a state's Eleventh Amendment immunity. *Quern v. Jordan*, 440 U.S. 332 (1979).

**1. Monroe County Domestic Relations Section.**

"The Eleventh Amendment's protection . . . is not limited to the States alone, but rather extends to entities that function as 'arms of the State.'" *Maliandi*, 845 F.3d at 81. "The Pennsylvania constitution provides for the vesting of the Commonwealth's judicial power in a "unified judicial system" which includes all of the courts in Pennsylvania." *Callahan v. City of Philadelphia*, 207 F.3d 668, 672 (3d Cir. 2000) (quoting Pa. Const. art. V, § 1.). "Moreover, the constitution provides that the Pennsylvania Supreme Court will exercise 'general supervisory

and administrative authority' over the unified judicial system." *Id*. (quoting Pa. Const. art. V, §§ 1, 2, and 10.). Thus, "[a]ll courts and agencies of the unified judicial system . . . are part of 'Commonwealth government' and thus are state rather than local agencies." *Id*. (citing Pa. Const. art. V, § 6(c); 42 Pa. Cons. Stat. Ann. § 102; 42 Pa. Cons. Stat. § 301). As such, they are entitled to Eleventh Amendment immunity. *Benn v. First Judicial Dist. of Pa.*, 426 F.3d 233, 241 (3d Cir. 2005) ("The Pennsylvania constitution envisions a unified state judicial system, of which the Judicial District is an integral component. From a holistic analysis of the Judicial District's relationship with the state, it is undeniable that Pennsylvania is the real party in interest in Benn's suit and would be subjected to both indignity and an impermissible risk of legal liability if the suit were allowed to proceed.").

"Under Pennsylvania law, each court of common pleas must have a domestic relations section, '"which shall consist of such probation officers and other staff of the court as shall be assigned thereto."' *Haybarger v. Lawrence Cnty. Adult Prob. & Parole*, 551 F.3d 193, 201 (3d Cir. 2008) (quoting 42 Pa. Cons. Stat. § 961 (2008)). Thus, "[c]ounty domestic relations sections are part of the unified judicial system." *Siluk v. Merwin*, 783 F.3d 421, 423 n.5 (3d Cir. 2015), *abrogated on other grounds by Bruce v. Samuels*, 577 U.S. 82, 84 (2016). And they are entitled to Eleventh Amendment immunity. *Bryant v. Cherna*, 520 F.

App'x 55, 57 (3d Cir. 2013) (stating that "the state courts of Pennsylvania, including their domestic relations sections, are entitled to immunity from suit in federal court pursuant to the Eleventh Amendment"); *Green v. Domestic Rels. Section Ct. of Common Pleas Compliance Unit Montgomery Cnty.*, 649 F. App'x 178, 180 (3d Cir. 2016) (concluding that because "the Domestic Relations Section of the Montgomery County Court of Common Pleas, is a sub-unit of Pennsylvania's unified judicial system," the claims against it were properly dismissed pursuant to the Eleventh Amendment).

Because the Monroe County Domestic Relations Section is a division of the Court of Common Pleas of Monroe County, which is a part of the state, it is entitled to Eleventh Amendment immunity. Thus, we will recommend that the court dismiss Benson's claims against the Monroe County Domestic Relations Section without prejudice for lack of subject-matter jurisdiction.

**2. Defendants Higgins and Pryce in their Official Capacities.**

Benson's claims for damages against defendant Higgins and Pryce in their official capacities are also barred by the Eleventh Amendment. Official-capacity suits are "only another way of pleading an action against an entity of which an officer is an agent." *Monell,* 436 U.S. at 690 n. 55. In an official-capacity suit, the entity of which the officer is an agent is the real party in interest. *Kentucky v.*

*Graham*, 473 U.S. 159, 166 (1985). As such, claims against state officials in their official capacities for damages are treated as suits against the state and are barred by the Eleventh Amendment. *Christ the King Manor, Inc.*, 730 F.3d at 318. Thus, Benson's claims for damages against defendants Higgins and Pryce in their official capacities are barred by the Eleventh Amendment. As such, we will recommend that the court dismiss those claims without prejudice for lack of subject-matter jurisdiction.

Although claims against state officials in their official capacities for damages are barred by the Eleventh Amendment, under *Ex parte Young*, generally claims against state officials in their official capacities for prospective declaratory and injunctive relief are not barred by the Eleventh Amendment. *See Ex parte Young*, 209 U.S. 123 (1908). Here, in addition to damages, Benson is seeking declaratory and injunctive relief.

In determining if *Ex parte Young* applies, the court "must look to the substance rather than the form of the relief requested to determine whether [the] claims are barred by the Eleventh Amendment." *Blanciak*, 77 F.3d at 698. And "[t]he type of prospective relief permitted under *Young* is relief intended to prevent a continuing violation of federal law." *Hindes v. F.D.I.C.*, 137 F.3d 148, 166 (3d Cir. 1998); *see also Papasan v. Allain*, 478 U.S. 265, 277–78 (1986) (observing that "*Young* has been focused on cases in which a violation of federal law by a

state official is ongoing"). "In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 645 (2002) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 296 (1997) (concurring opinion)).

Here, it is unclear what, if any proceedings, remain ongoing in the state court. Thus, it is not clear whether Benson's requests for declaratory and injunctive relief are requests for prospective relief with the scope of *Ex parte Young*.

In any event, the *Ex parte Young* exception does not apply to the claims for declaratory and injunctive relief as against Judge Higgins. As the Supreme Court has explained, *Ex parte Young* does not permit federal courts to issue injunctions against state-court judges and clerks:

> Generally, States are immune from suit under the terms of the Eleventh Amendment and the doctrine of sovereign immunity. See, *e.g.*, *Alden v. Maine*, 527 U.S. 706, 713, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999). To be sure, in *Ex parte Young*, this Court recognized a narrow exception grounded in traditional equity practice—one that allows certain private parties to seek judicial orders in federal court preventing state executive officials from enforcing state laws that are contrary to federal law. 209 U.S. 123, 159–160, 28 S.Ct. 441, 52 L.Ed. 714 (1908). But as *Ex parte Young* explained, this traditional exception does

> not normally permit federal courts to issue injunctions against state-court judges or clerks. Usually, those individuals do not enforce state laws as executive officials might; instead, they work to resolve disputes between parties. If a state court errs in its rulings, too, the traditional remedy has been some form of appeal, including to this Court, not the entry of an *ex ante* injunction preventing the state court from hearing cases. As *Ex parte Young* put it, "an injunction against a state court" or its "machinery" "would be a violation of the whole scheme of our Government." *Id.*, at 163, 28 S.Ct. 441.

*Whole Woman's Health v. Jackson*, 595 U.S. 30, 39 (2021). Thus, *Ex parte Young* does not save the claims against Judge Higgins in his official capacity. *See Oyelakin v. Clerk of Philadelphia Fam. Ct.*, No. CV 25-3748, 2025 WL 3633211, at *10 (E.D. Pa. Dec. 12, 2025) (concluding that "*Ex parte Young* does not apply to the relief [the plaintiff] seeks here[:] prospective injunctive relief against the Judicial Defendants in an effort to void decisions of the Philadelphia Family Court he does not like"). Accordingly, we will recommend that the court dismiss the claims for declaratory and injunctive relief against Judge Higgins in his official capacity. Because it is not initially clear if the claims for declaratory and injunctive relief against defendant Pryce in her official capacity should be dismissed for the same reason, the court may benefit from briefing on that issue from the parties. Thus, we do not at this time, recommend that the claims for declaratory and injunctive relief against defendant Pryce in her official capacity be dismissed.

In sum, we recommend that the court dismiss the claims against the Monroe County Domestic Relations Section, the claims for damages against defendants Higgins and Pryce in their official capacities, and the claims for declaratory and injunctive relief against defendant Higgins in his official capacity because such claims are barred by the Eleventh Amendment. And because the Eleventh Amendment implicates the court's subject-matter jurisdiction, we recommend that the court dismiss those claims barred by the Eleventh Amendment without prejudice. *See Mohn v. United States*, No. 23-1023, 2023 WL 4311609, at *2 (3d Cir. July 3, 2023) (observing that "when a district dismisses claims for lack of subject matter jurisdiction, the dismissal should be without prejudice"); *Merritts v. Richards*, 62 F.4th 764, 772 n.4 (3d Cir. 2023) (concluding that claims barred by the Eleventh Amendment should have been dismissed without prejudice and noting that "a dismissal with prejudice on a threshold ground [such as the Eleventh Amendment] should ordinarily be vacated and remanded with instructions for the claim to be dismissed without prejudice").[18]

---

[18] Dismissal "without prejudice" is often used to indicate that the plaintiff may amend his complaint. But in the context of a dismissal for lack of subject-matter jurisdiction, a dismissal "without prejudice" indicates that the claim was not decided on the merits. '"A dismissal with prejudice operates as an adjudication on the merits' and typically prevents the plaintiff from subsequently litigating his claims in either the original court or any other forum." *Aldossari on Behalf of Aldossari v. Ripp*, 49 F.4th 236, 262 (3d Cir. 2022) (quoting *Papera v. Pennsylvania Quarried Bluestone Co.*, 948 F.3d 607, 611 (3d Cir. 2020)).

**B. Benson's motion for a temporary restraining order and preliminary injunction should be denied.**

Benson is seeking a temporary restraining order and a preliminary injunction. He seeks an order stopping the defendants from going forward with the contempt hearing on May 26, 2026. He also seeks an order staying and vacating the May 5, 2026 order that suspended his driver's license. And he seeks an order enjoining the defendants from taking any further enforcement actions regarding his support case.

Federal Rule of Civil Procedure 65 governs temporary restraining orders and preliminary injunctions. The standard for deciding motions for temporary restraining orders and motions for preliminary injunctions are generally the same. "The difference is that a [temporary restraining order] may be issued with little or

---

"Conversely, a [d]ismissal . . . without prejudice is a dismissal that does not operat[e] as an adjudication upon the merits, . . . and thus does not have a [claim-preclusive] effect." *Papera*, 948 F.3d at 611 (internal quotation marks and citations omitted). And "[i]f a court . . . determines that it lacks subject matter jurisdiction, it cannot decide the case on the merits." *In re Orthopedic "Bone Screw" Prod. Liab. Litig.*, 132 F.3d 152, 155 (3d Cir. 1997). "It has no authority to do so." *Id*. Thus, a dismissal for lack of subject-matter jurisdiction "must be without prejudice." *Aldossari,* 49 F.4th at 262. "Even when a district court determines that granting leave to amend would be futile," "a dismissal for lack of [subject-matter jurisdiction] must be 'without prejudice[.]'" *Cook v. GameStop, Inc.*, 148 F.3d 153, 163 (3d Cir. 2025) (quoting *Barclift v. Keystone Credit Servs., LLC*, 93 F.4th 136, 148 (3d Cir. 2024)). Although we recommend that the claims that are barred by the Eleventh Amendment be dismissed without prejudice for lack of subject-matter jurisdiction, we recommend that the court not grant Benson leave to amend as to such claims because leave to amend would be futile.

no notice and may dissolve on its own accord." *Ameriprise Fin. Servs., Inc. v. Koenig*, No. CIV.A. 11-6140-NLH, 2012 WL 379940, at *4 (D.N.J. Feb. 6, 2012); Fed. R. Civ .P. 65(b) (providing that the court may issue a temporary restraining order "without written or oral notice to the adverse party" if certain conditions are met).

A motion for a preliminary injunction is judged against exacting legal standards. "A preliminary injunction is an 'extraordinary' equitable remedy that is 'never awarded as of right.'" *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345–46 (2024) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). A motion for such is properly granted only if such relief is the "only way of protecting the plaintiff from harm." *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989). "It has been well stated that upon an application for a preliminary injunction to doubt is to deny." *Madison Square Garden Corp. v. Braddock*, 90 F.2d 924, 927 (3d Cir. 1937).

When evaluating a motion for preliminary injunctive relief, the court considers four factors: '"(1) a likelihood of success on the merits; (2) that [the plaintiff] will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to [the defendant]; and (4) that the public interest favors such relief.'" *Smith v. City of Atl. City*, 138 F.4th 759, 779 (3d Cir. 2025) (quoting *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700,

708 (3d Cir. 2004)). "The first two factors are the 'most critical,' and only if the moving party has made the requisite showing for both must the district court reach the remainder." *Johnson & Johnson v. Samsung Bioepis Co.*, 173 F.4th 454, 460 (3d Cir. 2026) (quoting *Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 202 (3d Cir. 2024)). "In a case involving a government defendant, the last two factors may be combined." *Smith*, 138 F.4th at 779. "Because a preliminary injunction is an extraordinary and drastic remedy, the movant bears the burden of making *a clear showing." Delaware State Sportsmen's Ass'n,* 108 F.4th at 202 (internal quotation marks and citation omitted; italics in original).

Benson seeks an order stopping the defendants from going forward with the contempt hearing on May 26, 2026. But Benson did not file this action or his motion for temporary restraining order until June 1, 2026. And since May 26, 2026, has already passed, Benson's request in this regard is moot.

Benson also seeks an order staying and vacating the May 5, 2026 order that suspended his driver's license and an order enjoining the defendants from taking any further enforcement actions regarding his support case. But Benson has not

shown a likelihood of success on the merits of his claims such that he is entitled to injunctive relief.[19]

As to the claims against defendant Higgins in his individual capacity it is likely that defendant Higgins is entitled to judicial immunity from such claims—both the claims for damages and the claims for injunctive relief.

"The Supreme Court long has recognized that judges are immune from suit under section 1983 for monetary damages arising from their judicial acts." *Gallas v. Supreme Court of Pennsylvania*, 211 F.3d 760, 768 (3d Cir. 2000). The Court has described the reasons for recognizing judicial immunity as follows:

> [T]he nature of the adjudicative function requires a judge frequently to disappoint some of the most intense and ungovernable desires that people can have . . . . [T]his is the principal characteristic that adjudication has in common with legislation and with criminal prosecution, which are the two other areas in which absolute immunity has most generously been provided. If judges were personally liable for erroneous decisions, the resulting avalanche of suits, most of them frivolous but vexatious, would provide powerful incentives for judges to avoid rendering decisions likely to provoke such suits.

---

[19] Here, although we conclude that Benson does not have a reasonable probability of success on the merits of his claims for purposes of preliminary injunctive relief, we do not determine whether he has stated any claims upon which relief can be granted. And because Benson is not a prisoner and he is not proceeding *in forma pauperis*, we are not sua sponte screening the complaint to determine whether it fails to state a claim upon which relief can be granted. As discussed earlier, we sua sponte recommended that the court dismiss the claims barred by the Eleventh Amendment because the Eleventh Amendment implicates the court's subject-matter jurisdiction. Where subject-matter jurisdiction is not implicated, we do not recommend, at this stage of the proceedings, dismissal of claims.

> The resulting timidity would be hard to detect or control, and it would manifestly detract from independent and impartial adjudication.

*Forrester v. White*, 484 U.S. 219, 226–27 (1988) (citations omitted).

We engage in a two-part inquiry to determine whether judicial immunity is applicable. *Gallas,* 211 F.3d at 768. First, because immunity applies only to actions taken in a judge's judicial capacity, we must determine whether the challenged actions of the judge were taken in his or her judicial capacity. *Id.* The relevant factors "relate to the nature of the act itself, i.e., whether it is a function normally performed by a judge, and to the expectations of the parties, i.e., whether they dealt with the judge in his judicial capacity.'" *Id.* at 768–69 (quoting *Stump v. Sparkman*, 435 U.S. 349, 362 (1978)). "Our task is to 'draw the line between truly judicial acts, for which immunity is appropriate, and acts that simply happen to have been done by judges,' such as administrative acts." *Id.* at 769 (quoting *Forrester,* 484 U.S. at 227).

"Second, a judge is not immune for actions, though judicial in nature, taken in the complete absence of all jurisdiction." *Id.* at 768. In this regard, "we must distinguish between acts in the 'clear absence of all jurisdiction,' which do not enjoy the protection of absolute immunity, and acts that are merely in 'excess of jurisdiction,' which do enjoy that protection." *Id.* at 769 (quoting *Stump*, 435 U.S. at 356 n.6). Judicial immunity shields a judge from liability for judicial acts even

if those acts were taken in error, if they were done maliciously, if they were in excess of the judge's authority, if the judge committed grave procedural errors, or if the judge's actions were unfair or controversial. *Id.* A judge will be subject to liability only when he or she has acted in the clear absence of all jurisdiction. *Id.* "In sum, our analysis must focus on the general nature of the challenged action, without inquiry into such 'specifics' as the judge's motive or the correctness of his or her decision." *Id.*

Here, Benson's allegations regarding defendant Higgins relate to actions taken by Higgins in his capacity as a judge overseeing a child-support case in the Court of Common Pleas. And his actions were not taken in the clear absence of all jurisdiction. *See Gittens v. Pavlack*, 838 F. App'x 717, 718 (3d Cir. 2021) (concluding that judge's order that the plaintiff's "bank assets be frozen pursuant to state law governing the enforcement of child support obligations" was "a judicial act that was made in accordance with state law" and thus the judge was immune from damages liability). Accordingly, defendant Higgins is entitled to judicial immunity from Benson's § 1983 claim for damages against him.

Turning to injunctive relief, such relief also appears improper as to defendant Higgins. "Except in very limited circumstances, judges are immune from personal-capacity suits for injunctive relief." *Wilson v. United States*, Civ. No. 21-10004 (JXN) (JBC), 2022 WL 180326, at *5 (D.N.J. Jan. 20, 2022). In

*Pulliam v. Allen*, 466 U.S. 522, 541–42 (1984), the Supreme Court held that "judicial immunity is not a bar to prospective injunctive relief against a judicial officer acting in her judicial capacity." Later, however, as part of the Federal Courts Improvement Act of 1996, "Congress amended 42 U.S.C. § 1983 to provide that 'injunctive relief shall not be granted' in an action brought against 'a judicial officer for an act or omission taken in such officer's judicial capacity . . . unless a declaratory decree was violated or declaratory relief was unavailable.'" *Azubuko v. Royal*, 443 F.3d 302, 304 (3d Cir. 2006) (quoting 42 U.S.C. § 1983). Here, Benson does not allege that defendant Higgins violated a declaratory decree or that declaratory relief was unavailable. Thus, the Federal Courts Improvement Act of 1996 bars Benson's claims for injunctive relief as to defendant Higgins.

Concluding that Benson does not have a reasonable probability of success on his claims against defendant Higgins, we turn to Benson's claims against defendant Pryce. Because Benson is suing Pryce for her role in initiating and prosecuting the child support case against him, Pryce is entitled to quasi-judicial immunity as to the claims for damages against her in her individual capacity. County Domestic Relation Section "employees enjoy the benefits of absolute quasi[-]judicial immunity because (1) their functions in proceedings are closely analogous to the functions performed by prosecutors in criminal proceedings; (2) 'the public policy considerations that countenance immunity for prosecutors are applicable to

Domestic Relations Section employees performing these functions; and (3) support proceedings incorporate important safeguards that protect citizens from unconstitutional actions by such employees." *Dustin of the Family Patrick v. Brown*, No. 5:25-CV-1847, 2026 WL 1747215, at *7 (E.D. Pa. June 17, 2026) (internal quotation marks and citation omitted). Thus, Pryce in her individual capacity is entitled to quasi-judicial immunity from damages for such actions in prosecuting Benson's support proceedings. *See Bryant v. Cherna*, 520 F. App'x 55, 58 (3d Cir. Mar. 28, 2013) ("Any claims against the[ ] employees [of a county's Domestic Relations Section] in their individual capacities for their roles in initiating and prosecuting child support proceedings would be barred by the doctrine of quasi-judicial immunity."); *Lepre v. Tolerico*, 156 F. App'x 522, 525 (3d Cir. 2005) (concluding that the defendants, who were "officers of the Domestic Relations Section of the Family Court of Lackawanna County, are entitled to quasi-judicial immunity for their actions in filing the Petition enforcing the Family Court's support order in accordance with Pennsylvania Rule of Civil Procedure 1910.25").

Benson asserts that he is seeking an order enjoining the defendants from taking any new enforcement actions. But he has not reasonably shown what new enforcement actions Pryce is likely to take in this case. Rather, although he asserts that he is seeking an injunction regarding new enforcement actions, he actually

refers to actions that have already been taken. *See doc. 3-4* ¶ 3 (Proposed Order—seeking an order providing that "Defendants are preliminarily enjoined from taking any new enforcement actions, including but not limited to driver's license suspension, contempt proceedings, credit reporting, or tax refund interception, arising from the arrears claimed in Monroe County Support Case #195303101, until this Court resolves the merits of Plaintiff's Verified Complaint."). In sum, Benson has not shown that Pryce is reasonably likely to take additional enforcement actions in the near future.

For the reasons set forth above, Benson does not have a reasonable probability of success on the merits of his claims.

## IV. Recommendations.

Because Benson's claims against the Monroe County Domestic Relations Section, the claims against Judge Higgins in his official capacity, and the claims for damages against Pryce in her official capacity are barred by the Eleventh Amendment, we recommend that the court dismiss those claims without prejudice for lack of subject-matter jurisdiction. We further recommend that the court deny Benson's motion for a temporary restraining order and preliminary injunction (*doc. 3*). Finally, we recommend that the court remand the case to undersigned for further proceedings.

The Parties are further placed on notice that pursuant to Local Rule 72.3:

> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 20th day of July, 2026

***S/Susan E. Schwab***
Susan E. Schwab
United States Magistrate Judge